UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Respondent<br><br>v.<br><br>E-GOLD, LTD, *et al.*,<br><br>Petitioners. | No. 07-cr-109-ABJ-ZMF |

**Report and Recommendation**

On July 20, 2020, petitioners E-Gold, Gold and Silver Reserve, Inc. ("G&SR"), Douglas Jackson, Reid Jackson, and Barry Downey filed this writ of *coram nobis* requesting to vacate their criminal convictions from 14 years ago. Judge Amy Berman Jackson referred this matter to a magistrate judge for a Report and Recommendation pursuant to Local Civil Rule 59.2. *See* Minute Order, Aug. 31, 2021. Upon careful consideration of the motions, responses, and replies thereto; the applicable law; and the entire record; the undersigned recommends DENYING petitioners' Writ of Error Coram Nobis.

**I.   BACKGROUND**

    A.   The Investigation and Indictment

Petitioners' virtual currency business, E-Gold, Ltd., "operated via the Internet using the domain name www.e-gold.com and began offering the digital currency 'e-gold.'" ECF No. 104 at 2. Customers bought "e-gold" using fiat currency and then used "e-gold" to buy goods and services from merchants accepting "e-gold." *See id.* Petitioners' business operated out of Florida and serviced customers throughout the country. *See id.* at 6.

Between 2006 and 2008, the Department of Justice ("DOJ") investigated criminal violations by the petitioners. On April 3, 2008, a federal grand jury in the District of Columbia returned a superseding indictment charging:

- all petitioners with (1) conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956; (2) conspiring to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960; and (3) operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960, *see* ECF No. 104 at ¶¶ 28, 49, 77; and

- Douglas Jackson, Barry Downey, and Reid Jackson with also (1) violating the District of Columbia's Money Transmitters Act ("MTA"), 26 D.C. Code § 1023(c); and (2) engaging in the business of money transmission without a license, in violation of 26 D.C. Code § 1002, *see id.* at 79.

The indictment alleged the petitioners conspired to grow their business and increase profitability via illicit means. *See id.* ¶ 30. It explained that the individual petitioners had varying management roles in E-Gold and G&SR. *Id.* ¶ 16-18. The indictment further alleged that the petitioners:

- did not require customers to provide their true identities to open an account and hired inexperienced employees who received no training on how to detect criminal transactions. *See id*. ¶¶ 31-32. As an example, "thousands" of E-Gold users opened their accounts with false identifiers such as "Mickey Mouse," "Donald Duck," "Anonymous Man," "bud weiser," and "No Name." *Id.* ¶ 21.

- knowingly allowed transactions from illicit accounts to occur and did not report these accounts to law enforcement. *See id*. ¶¶ 34-36. For example, petitioners understood

that accounts with "hyip" [high yield investment program] in their name were used to fund investment scams yet took no proactive measures to stop them. *See id.* ¶ 24. Petitioners purportedly encouraged users whose criminal activity had been discovered to transfer their criminal proceeds among other "e-gold" accounts. *See id.* ¶ 37.

On May 30, 2008, the petitioners moved to dismiss counts two, three, and four of the indictment. *See* ECF No. 93. Section 1960(a) criminalizes the operation of an "unlicensed money transmitting businesses," which incorporates a possible state law violation. That is, § 1960(b)(1) delineates three independent definitions of such businesses: (A) where the business operates without "the appropriate money transmitting license under State law;" (B) fails to register with federal authorities; or (C) knowingly transmits funds derived from, or used to promote illicit activity. Petitioners argued that E-Gold was not a "money transmitting business" because "18 U.S.C. § 1960 applies only to businesses that engage in cash transactions" and thus their business was not required to be licensed by the state or register with Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"). *See id.* The Court rejected petitioners' arguments, holding that E-Gold was a "money transmitting business" by the "plain meaning of the statute and the obvious intent of Congress." ECF No. 110 at 30.

B. <u>Plea Agreements</u>

On July 21, 2008:

- E-Gold and G&SR pled guilty to: (1) conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956(h); and (2) conspiring to operate an unlicensed money transmitting business—by operating without a license from the D.C. Department of Insurance, Securities, and Banking ("DISB"), failing to register with FinCEN, and

      transmitting criminal proceeds—in violation of 18 U.S.C. §§ 371 and 1960, *see* ECF Nos. 133, 136;

- Douglas Jackson pled guilty to: (1) conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956(h); and (2) operating an unlicensed money transmitting business—by operating without a license from DISB, failing to register with FinCEN, and transmitting criminal proceeds—in violation of 18 U.S.C. § 1960(a), *see* ECF No. 139; and

- Barry Downey and Reid Jackson pled guilty to engaging in the business of money transmission without a license from DISB, in violation of 26 D.C. Code § 1002, *see* ECF Nos. 130, 142.

Each petitioner admitted a sworn statement of facts as the basis for their guilty plea. *See* ECF Nos. 131 ("Reid Jackson's Statement of Offense"), 134 ("G&SR's Statement of Offense"), 137 ("E-Gold's Statement of Offense"), 140 ("Douglas Jackson's Statement of Offense"), 143 ("Barry Downey's Statement of Offense"). E-Gold, G&SR, and Douglas Jackson admitted to violating 18 U.S.C. § 1960 by "knowingly conduct[ing], control[ing], manag[ing], supervis[ing], direct[ing], and own[ing] all or part of an unlicensed money transmitting business" which: (i) "operated without an appropriate money transmitting license in the District of Columbia"; (ii) "failed to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330]" and; (iii) "otherwise involved the transportation and transmission of funds known to the defendant to have been derived from a criminal offense and intended to be used to promote and support unlawful activity." Gold and Silver Reserve's Statement of Offense at 2, E-Gold's Statement of Offense at 2, Douglas Jackson's Statement of Offense at 2.

E-Gold, G&SR, and Douglas Jackson also admitted to violating 18 U.S.C. § 1956 by "knowingly conduct[ing] and attempt[ing] to conduct financial transactions affecting interstate and foreign commerce, that is transfers of 'e-gold' from one account to another, which involved the proceeds of a specified unlawful activity, that is child exploitation, wire fraud, and access device fraud." E-Gold's Statement of Offense at 5. They further admitted that E-Gold "did not require users to validate their true identity or any specific identity," and that E-Gold hired employees with no experience in conducting anti-money laundering reviews and insufficiently trained them. *Id*. at 5-6. E-Gold's officers, principals, and employees regularly "believed that certain accounts were being used for criminal purposes" even labelling certain accounts by the criminal activity that they were engaged in, including child exploitation, wire fraud, and credit card fraud. *Id*. at 6. Yet the petitioners nevertheless allowed outbound transactions from these accounts. *See id.* Petitioners admitted that they would transfer funds from an account believed to be engaged in criminal activity to another account operated by the same individual at the request of its customer. *Id.* at 7.

Petitioners Barry Downey and Reid Jackson admitted that they violated 26 D.C. Code § 1002 by "operat[ing] the E-Gold['s] [] money transmitting business without a license in the District of Columbia." Reid Jackson's Statement of Offense at 4; Barry Downey's Statement of Offense at 4.

The Court sentenced the petitioners as follows:

- EGL and G&SR to 36 months of supervised release and a $300,000 fine, ECF Nos. 180, 182;
- Douglas Jackson to time served and 36 months of supervised release, *see* ECF Nos. 189; and

5

- Barry Downey and Reid Jackson to suspended sentences of 180 days of imprisonment and 36 months of supervised release, *see* ECF Nos. 184, 186.

In 2011, all petitioners completed their periods of supervision.

    C.    <u>Petitioners' Investigation into their Guilty Pleas</u>

In June 2016, DISB issued an opinion that a virtual currency business (which allegedly operated similarly to the petitioners' business) was not required to register as a money transmitter. *See* Def.'s Pet. Exh. 12. After reviewing the DISB opinion, petitioners began to investigate the circumstances surrounding their own criminal proceedings. *Id.* at 13. Petitioners submitted public record requests to DISB and Florida's Office of Financial Regulation ("Florida OFR") regarding whether either agency had considered if petitioners were required to register as a money transmitter.[1] *See id*.

Petitioners' request yielded an unpublished Florida OFR legal opinion ("Draft OFR Opinion") written by an assistant general counsel. *See id*. This four-page opinion was an internal, informal summary of E-Gold's business and an assessment of whether a court would find E-Gold's conduct fell under Floridian money transmitting statutes. *See id*. In relevant part, the Draft OFR Opinion stated:

> To the extent that courts do not reject E-Gold's and G&SR's business model as a sham transaction, currency converted into E-gold units is still being transmitted as currency and the Money Transmitter's Code covers the transmission of it. Based upon the description of the e-gold business model as it is currently known and described herein, this writer believes [the position] that funds are not being transmitted, is more appropriate. This is based upon the possibility that a court might determine that a statute authorizing the

---

[1] Although E-Gold operated nationwide, petitioners appear to have limited their requests to regulators in D.C.—where the prosecution occurred—and Florida—where E-Gold was based.

6

>Office to seek fines for unregistered money transmitting is a penal statute. Penal statutes are strictly construed.

Def.'s Pet. Exh. 9 at 3.  Florida OFR never adopted or published the Draft OFR Opinion.  *See* Def.'s Pet. Exh. 12 at 1, 4.  Indeed, the author labeled the opinion with a "*draft*" header.  *See id.*  And the Draft OFR Opinion's signature block for supervisory approval was left unsigned.  *See id.*

Petitioners' record request also revealed communications between the Florida OFR and the DOJ.  In these communications, the DOJ requested that the Florida OFR "not interview[] Douglas Jackson or any of the employees at G&SR" so G&SR did not have the "opportunity to boast about [their] cooperation . . . assisting government regulators."  Def.'s Pet. Exh. 2.  The DOJ also inquired whether E-Gold would "fall under [Florida's] money transmitter statutes" and requested that the Florida OFR delay any "declarations or orders regarding the regulatory status of E-Gold" until DOJ's investigation and prosecution concludes.  Def.'s Pet. Exh. 10.

Petitioners argue that the DOJ's conduct amounts to a violation of its obligation to disclose exculpatory material.  *See Brady v. Maryland*, 373 U.S. 83 (1963).  Petitioners filed this writ of *coram nobis* to vacate their convictions as relief for the failure to disclose the Draft OFR opinion.

## II. LEGAL STANDARD

"[T]he authority to grant a writ of *coram nobis* is conferred by the All Writs Act, which permits 'courts established by Act of Congress' to issue 'all writs necessary or appropriate in aid of their respective jurisdictions.'"  *United States v. Denedo*, 556 U.S. 904, 911 (2009) (quoting 28 U.S.C. § 1651(a)).  The writ of *coram nobis* "provides a way to collaterally attack a criminal conviction for a person . . . who is no longer in custody and therefore cannot seek habeas relief."  *United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  However, "courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases."  *Denedo*, 556 U.S. at 916.  For example, a change in law that

undercut an underlying conviction has been the basis for granting *coram nobis*. *See United States v. Hansen*, 906 F. Supp. 688 (D.D.C. 1995) (subsequent decriminalization of defendant's conduct warranted *coram nobis*). Ultimately, *coram nobis* is "rarely granted." *United States v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C. 2013) (quoting *Craven v. United States*, 26 Fed. Appx. 417, 419 (6th Cir. 2001)).

**III.   ANALYSIS**

Courts have applied a four-part *coram nobis* test:

> (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*Hansen*, 906 F. Supp. at 692-93. When a party pleads guilty, it is "subject to higher standards for issuance of *coram nobis*." *Murray v. United States*, 704 F.3d 23, 32 (1st Cir. 2013).

First, petitioners argue that *coram nobis* is the proper remedy to attack their conviction because they have completed their sentence and no other form of relief is available. *See* Def.'s Pet. at 15. Second, they contend that they could not have attacked their conviction earlier because they were not aware of the existence of the Draft OFR Opinion. *See id*. at 16. Third, they argue the collateral consequence petitioners face of losing their right to serve on a jury and to own a firearm are sufficient to satisfy the standing requirements of Article III.[2] *See id.* at 20. Finally, they argue that the government's conduct in suppressing the Draft OFR opinion amounts to a *Brady* violation, which constitutes an "error of the most fundamental character." *Id.* at 22.

---

[2] These collateral consequences do not touch the corporate petitioners. Indeed, there is a dearth of caselaw whether a corporation can seek post-conviction relief based on collateral consequences. DOJ guidance seems to imply the answer is yes, as it found a corporation eligible for a pardon. *See* Margaret Colgate Love, Jenny M. Roberts & Cecelia Klingele, *Collateral Consequences for Corporations* § 2:79 (Nov. 2021). Regardless, it is immaterial here as the Court denies *coram nobis* relief for other reasons.

Petitioners failed to prove the fourth prong for two reasons. First, even if a *Brady* violation "qualifies as an error of 'the most fundamental character'"—which is not a given—petitioners failed to demonstrate a *Brady* violation. *Shin v. United States*, 782 F. App'x 595, 596 (9th Cir. 2019) (denying *coram nobis*). Second, petitioners' guilty pleas "warrant [against] an affirmative exercise of [] discretion" to grant *coram nobis*. *U.S. v. George*, 676 F.3d 249, 258 (1st Cir. 2012).

A.   *Brady* Claim

The prosecution has an obligation to disclose "evidence favorable to the accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. As such, "[t]here are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Nelson*, 979 F. Supp. 2d 123, 130–31 (D.D.C. 2013) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82, (1999)). "Strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed[3] evidence would have produced

---

[3] It is unclear whether the Draft OFR Opinion was "suppressed." Evidence is not suppressed when it is in the possession of a third-party who is not "part of the prosecution team." *United States v. Spencer*, 873 F.3d 1, 9 (1st Cir. 2017). However, third parties acting on the government's behalf are considered part of the prosecution team. *See In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). The Draft OFR Opinion appears to have been in the exclusive control of the Florida OFR, which "was not an employee of any arm of the United States." *United States v. Dermen*, No. 218-cr-00365, 2021 WL 515883, at *25 (D. Utah Feb. 10, 2021). There is no indication that the DOJ "ha[d] access to or constructive control over [the Florida OFR]," without which Florida OFR is arguably not part of the prosecution team. *Id.* Indeed, that the DOJ asked, rather than compelled, the Florida OFR to not act further demonstrates the DOJ's disassociation with the Florida OFR.

Additionally, evidence is not suppressed if it was "available to the defendant by another source." *United States v. Flynn*, 411 F. Supp. 3d 15, 28 (D.D.C. 2019). Petitioners were "certainly were

9

a different verdict." *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) (citing *Strickler*, 527 U.S. at 281).

### 1. The Draft OFR Opinion is not exculpatory

Information that is "neutral [or] speculative" about the crime to which a defendant pleads guilty is not exculpatory. *United States v. Flynn*, 411 F. Supp. 3d 15, 30 (D.D.C. 2019). In *Flynn*, the defendant sought an internal DOJ memorandum that contained alleged exculpatory information about his status as a foreign agent. *Id.* at 30. "[T]he Government ha[d] no duty to disclose" because the defendant pled guilty to making false statements to the FBI, *not* being a foreign agent. *Id.* Similarly, the Draft OFR Opinion is a "speculative" internal memorandum about Floridian law, which is "irrelevant to [the petitioners'] underlying offense," *i.e.*, a violation of D.C. law. *Id.*

Petitioners try to place a square peg in a round hole by forcing the draft interpretation of Floridian law onto D.C. law. Def.'s Pet. at 19. Petitioners justify this by claiming that both money transmission statutes are nearly identical. Yet, "49 unique state regulatory frameworks determine the general oversight and regulation of money transmitters. State laws are not identical . . . [as they have different] licensing and registration requirements." Andrew P. Scott, U.S. Cong. Rsch. Serv., R46486, *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* (2020). Although the statutes may have been similarly written, petitioners failed to demonstrate that so goes Florida, so goes D.C. Indeed, states regularly act differently, which

---

aware of [Florida OFR and D.C. DISB's] existence" and could have issued subpoenas requesting testimony and/or related records or asked for an advisory opinion. *United States v. Cheatham*, 899 F.2d 747,752-53 (8th Cir. 1990). When the "only reason for not obtaining . . . the evidence is [the] lack of reasonable diligence," the evidence cannot be considered suppressed. *United States v. White*, 970 F.2d 328 (7th Cir. 1992).

Ultimately, the Court need not delve into this fact intensive inquiry as the argument is not fully developed by the petitioners and there is a more direct basis to rejecting their claims.

10

makes them "laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez*, 514 U.S. 549, 581 (1995) (KENNEDY, J., concurring).

In fact, the Draft OFR Opinion was the opinion of one Florida man in 2006. The Florida OFR has not adopted it in the 15 years since. DOJ's request to temporarily pause any guidance while DOJ prosecuted E-Gold in 2008 cannot explain away why the Florida OFR *never* promulgated the draft guidance. Thus, even if D.C. parroted Floridian money transmitter regulations, that does not matter here given there was no official Floridian regulation to mimic.

    2.    The Draft OFR Opinion is immaterial

        a.    All petitioners

The Draft OFR Opinion is immaterial because petitioners previously litigated this same issue—whether E-Gold was a money transmitting business—and lost. In petitioners' joint motion to dismiss, they argued that E-Gold was not a "money transmitting business" because it did not engage in "cash transactions." ECF No. 93 at 8. This argument hinged upon whether § 1960 treated virtual currency businesses as money transmitters. *See id.* Although the motion to dismiss focused on the federal charge (§ 1960), petitioners' argument implicitly attacked the 26 D.C. Code § 1002 charge because the state violation was incorporated in § 1960(b)(1)(A). Petitioners neither sought an advisory opinion from D.C. DISB, nor subpoenaed witnesses from DISB to explain why E-Gold fell outside of the regulatory scheme. Judge Collyer rejected petitioners' argument. ECF No. 110 at 2-3. Her 32-page opinion analyzed 18 U.S.C. § 1960 and its legislative history. *See id.* Judge Collyer concluded that E-Gold was a "money transmitting business" by the "plain meaning of the statute and the obvious intent of Congress" and that "the words [of 18 U.S.C. § 1960] could scarcely suggest" a different interpretation. ECF No. 110 at 30. There is nothing to indicate Judge Collyer's analysis would have been impacted had she known how Floridian

11

regulators might apply Floridian law. Moreover, petitioners "waived the right" to "challenge the legal [licensure requirement] . . . by opting instead to enter into a plea bargain." *George*, 676 F.3d at 256–57.

### b. E-Gold, G&SR, and Douglas Jackson

The court has a "responsibility to evaluate the impact of the undisclosed evidence not in isolation, but in light of the rest of the [] record." *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999) (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)). The Draft OFR Opinion is also immaterial as to E-Gold, G&SR, and Douglas Jackson because it does not impact their guilty pleas to the alternative prongs of § 1960 or the § 1956 violation. When a statute provides alternative means of committing a crime, "the government need prove only one of the conjunctively connected offenses to warrant conviction." *United States v. Bader*, 698 F.2d 553, 555 (1st Cir. 1983).

#### i. Other prongs of § 1960 violation

The "three parts of [§ 1960] need not rise and fall together." *United States v. Harmon*, 474 F. Supp. 3d 76, 100 (D.D.C 2020). E-Gold, G&SR, and Douglas Jackson admitted to violating each of the three independent definitions within § 1960. *See* ECF Nos. 133, 136, 139. Specifically, they also admitted to failing to comply with the federal registration requirements and to "transport[ing] and transmit[ting] funds that [they] believed [were] derived from a criminal offense and were intended to be used to promote unlawful activity." E-Gold's Statement of Offense at 2; Douglas Jackson's Statement of Offense at 2; G&SR's Statement of Offense at 2. E-Gold, G&SR, and Douglas Jackson argue that the Draft OFR Opinion would have persuaded the court that E-Gold was not a "money transmitting business" because it was not required to obtain licenses under D.C. law. *See* Pet.'s Reply at 11. However, licensure is immaterial as to the failure to register

with the federal government or the transmission of illicit funds. *See Harmon*, 474 F. Supp. 3d at 100. Thus, E-Gold's, G&SR's, and Douglas Jackson's violations of § 1960(b)(1)(B) and (C) independently uphold their convictions. *See id.*

### ii.    § 1956 violation

E-Gold, G&SR, and Douglas Jackson also pled guilty to violating § 1956. *See supra*. They admitted to "conducting transfers of 'e-gold' from one account to another, which involved the proceeds . . . of child exploitation, wire fraud, and access device fraud." E-Gold's Statement of Offense at 5. E-Gold's "officers, principals, and employees" knew that accounts were used for criminal purposes. *Id.* at 6. They even labeled certain accounts as "child porn" and "credit card fraud," yet they "allowed outbound transactions from these accounts to continue." *Id.*

"[T]he Brady factors must be assessed count by count." *United States v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010). § 1956 is a more serious offense than § 1960—§ 1956 carries a maximum sentence of 20 years imprisonment in comparison to 5 years for § 1960. Yet E-Gold, G&SR, and Douglas Jackson ask the court to vacate their § 1956 conviction based on information that, at best, relates only to their § 1960 conviction. Whether E-Gold is considered a "money transmitting business" is immaterial to the § 1956 violation. Indeed, the words "money transmitting business" do not appear in § 1956. Because the existence of the Draft OFR opinion would not have altered the outcome of the proceeding, the Draft OFR opinion is immaterial for the purposes of *Brady*.[4] *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (evidence is only material if the result of the proceeding would have been different).

---

[4] Even if the Court were to consider granting relief, the "proper remedy [would be] to remand for resentencing," not vacating the conviction. *United States v. White*, 440 F.2d 978, 982 (5th Cir. 1971). It would be moot to do so here. E-Gold, G&SR, and Douglas Jackson would be subject to the more serious § 1956 violation for which they have already completed their sentences.

13

B.   Petitioners' Guilty Pleas

"[W]hen a defendant seeks to vacate a guilty-plea conviction by way of *coram nobis*, red flags accompany that request." *George*, 676 F.3d at 258. "If [a petitioner] fails to convince the court that the ends of justice will be served by granting such extraordinary relief, the court may refrain from upsetting a conviction [particularly that is based on a plea agreement and] that has long since become final." *George*, 676 F.3d at 255. The "interests of justice" are not served where "culpable conduct likely took place." *George*, F.3d at 258.

Petitioners' guilty pleas state a sufficient factual "basis for thinking that the [petitioners are] at least arguably guilty" of the charged offenses. *George*, 676 F.3d at 257 (citing *United States v. Gandia-Maysonet,* 227 F.3d 1, 6 (1st Cir. 2000)). Their operation of E-Gold—in which they *all* participated—included the transmission of illicit funds, *see supra*, the failure to register with FinCEN, *see supra*, and the failure to obtain a license from DISB, *see supra; Harmon*, 474 F. Supp. 3d at 100 (such licensure failure is both a D.C. code and § 1960 violation).[5] Indeed, the combination of the evidence of their guilt and "[the decision to plead guilty] counts against finding an error of the most fundamental character." *Id.* at 257.

Although not required, parties often offer evidence of their innocence when seeking post-conviction relief to demonstrate that it is in the interest of justice to exercise the court's discretion. *See Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (petitioner introduced new evidence including: the recantation of trial testimony, new photos and videos that were not available at trial, and new witnesses that disputed prosecution's theory of the case to demonstrate his innocence).

---

[5] Petitioners Barry Downey's and Reid Jackson's guilty pleas to the less serious D.C. code offenses further reflects their culpability, as defendants "rationally would maintain their guilty plea [as they were] charged with . . . more serious offense[s] encompassing the same conduct." *United States v. Caso*, 200 F. Supp. 3d 227, 236 (D.D.C. 2012).

14

Here, the petitioners have offered no evidence to rebut their guilt outside the Draft OFR Opinion, which as noted above, is immaterial. Instead, they argue that the DOJ has not supported any allegations beyond the indictment. Def.'s Reply at 23. Yet the lack of additional evidence is in large part because of "[petitioners'] own decision to . . . plead guilty" which prevented the DOJ from developing a "more robust factual record" at trial. *George*, 676 F.3d at 258. Without additional evidence of innocence, the record is insufficient to warrant the grant of *coram nobis*.

## IV. RECOMMENDATION

For these reasons, the Court recommends DENYING Petitioners' Writ of *Coram Nobis*.

## V. REVIEW BY THE DISTRICT COURT

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE